UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| PURPLE INNOVATION,<br><br>Plaintiff,<br><br>v.<br><br>FOSHAN DIRANI DESIGN FURNITURE; GLOBAL OCEAN TRADING; GUANG AN SHI LIN CHEN ZAI SHENG WUZI; GUANG ZHOU WEN JIE SHANG MAO YOUXIAN GONGSI; GUANGZHOUSHI BAIXIANGGUO KEJI YOUXIAN GONGSI; HANGZHOU LYDIA SPORTS GOODS; HEBEI ZEYONG TECHNOLOGY; HUBEI SHENG BINGYI DIANZI KEJI YOUXIAN GONGSI; KAIFENG SHI LONG TING QU CHEN YI SHANGMAO YOUXIAN GONGSI; LIU LIN XIAN XU BIN DIAN ZI CHANG PIN DIAN; NANCHANG SHIRONG BAO ER GUANGGAO YOUXIAN GONGSI; RUIAN XIN YUAN GUOJI MAO YI YOUXIAN GONGSI; SHANXI CHAO MA XUN KEJI YOUXIAN GONGSI; SHENZHEN BAIBAIKANG TECHNOLOGY; SHENZHEN LEADFAR INDUSTRY; SHENZHEN SHI MAI RUI KE DIANZI SHANGWU; SHENZHEN SHI YAN HUANG CHU HAI KEJI YOUXIAN GONGSI; SHENZHEN SHI YUXIANG MEIRONG YONGJU YOUXIAN GONGSI; WUHAN CHENKUXUAN TECHNOLOGY; XIAO DAWEI; XIAO XIAO PI FA SHANG MAO YOU XIAN ZE REN GONGSI; YARU WANG; YIWU YOURU E-COMMERCE; and ZHOU MENG BO,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:22-cv-620-HCN-DAO<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Purple Innovation, LLC brought this action against various Chinese companies, alleging trademark and patent infringement. Purple now moves for expedited discovery and a preliminary injunction against some of these companies that have defaulted. The requested injunction would

bar the advertisement and sale of allegedly infringing products and freeze certain assets. One of the defendants, Nanchang Shirong Bao Er Guanggao Youxian Gongsi Co., Ltd., moves to set aside the default entered against it. The court denies Nanchang's motion and grants Purple's motion.

I.

Purple is a Utah-based company that manufactures and sells mattresses, pillows, and seat cushions. Many of its products are made from a similar gelatinous elastomeric polymer, which is organized into a repeating grid pattern and is—true to the company's name—colored purple. *See* Dkt. No. 94 at 11–12 ¶¶ 41–42. Purple owns patents and trademarks relating to these products. At issue here are two of Purple's trademarks: United States Trademark Registration Numbers 6,971,732 and 6,971,734. These marks cover "the color purple as applied to the entire surface" of a pillow (the '732 Mark) or a seat cushion (the '734 Mark).

As relevant here, Purple alleges that some of the Chinese companies named in the amended complaint are infringing its '732 and '734 Marks and asserts claims against those companies under Sections 32(1)(a) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) & 1125(a). *See* Dkt. No. 94 at 19–23 ¶¶ 60–77; *id.* at 27–29 ¶¶ 98–105.

In April 2023, Magistrate Judge Oberg granted Purple's motion for leave to effect service of process by alternative means under Federal Rule of Civil Procedure 4(f)(3), authorizing Purple to serve by email those defendants for which Purple had provided active Amazon or Alibaba seller links and valid email addresses. *See* Dkt. No. 97.

Purple served many of the defendants—including Nanchang—in accordance with this order on May 12, 2023. *See* Dkt. No. 125. Each of the defendants that Purple served was thus required to file an answer or responsive motion no later than June 2, 2023. *See* Fed. R. Civ. P.

12(a)(i). None of those defendants did so. The clerk's office thus entered a default certificate at Purple's request on June 13, 2023. *See* Dkt. Nos. 136–37.

Two days later, Purple moved for a preliminary injunction against some of the now-defaulted defendants, including Nanchang. *See* Dkt. No. 138.[1] In that motion, Purple requested an order (1) "enjoining the advertising and sale of the [Defendants'] infringing products," *id.* at 7, (2) "temporarily freezing the [Defendants'] assets related to the sale of infringing [ ] products," *id.* at 33, and (3) "permitting Purple to conduct expedited discovery concerning the [Defendants'] financial information," *id.*

On July 14, 2023—almost a full month after the default was entered and Purple moved for a preliminary injunction—two attorneys for Nanchang entered appearances and moved for admission *pro hac vice*. *See* Dkt. Nos. 141–42. Yet neither Nanchang nor any of the other Defendants filed any response to Purple's motion. On July 27, 2023, the court thus entered a docket text order requiring the Defendants, including Nanchang, to show cause no later than August 18, 2023, why Purple's motion should not be granted. *See* Dkt. No. 145.

On August 18th—the last day permitted for showing cause, exactly 11 weeks after the deadline to file a responsive pleading to Purple's complaint had passed, more than 9 weeks after the clerk's office had entered a default certificate against Nanchang and Purple had moved for a preliminary injunction, and a full 5 weeks after Nanchang's attorneys had entered appearances—

---

[1] The defendants against whom Purple seeks preliminary relief are as follows: Global Ocean Trading Co. Ltd.; Guang Zhou Wen Jie Shang Maoyouxian Gongsi Co., Ltd.; Hubei Sheng Bingyi Dianzi Keji Youxian Gongsi Co. Ltd.; Kaifeng Shi Long Ting Qu Chen Yi Shangmao Youxian Gongsi Co., Ltd.; Nanchang Shirong Bao Er Guanggao Youxian Gongsi Co., Ltd.; Guang An Shi Lin Chen Zai Sheng Wuzi Co. Ltd.; Shenzhen Shi Yuxiang Meirong Yongju Youxian Gongsi Co., Ltd.; YaRu Wang; and Hebei Zeyong Technology Co., Ltd. *See* Dkt. No. 138 at 7. All of these are companies that Purple alleges are infringing the '732 Mark, the '734 Mark, or both. *See* Dkt. No. 94 at 19 & 21; *cf. id.* at 4–9 ¶¶ 7–9, 13–15, 18, 25, & 30. For simplicity, the court will refer to them in this opinion as the "Defendants."

Nanchang moved to set aside the default, *see* Dkt. No. 146, and filed a brief opposing Purple's preliminary-injunction motion, *see* Dkt. No. 147.

## II.

The court begins with Nanchang's motion to set aside the default. Federal Rule of Civil Procedure 55(c) allows a court to "set aside an entry of default for good cause." Although this Rule "poses a lesser standard for the defaulting party than the excusable neglect which must be shown for relief from judgment under [Federal Rule of Civil Procedure] 60(b)," *Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 775 n.6 (10th Cir. 1997), "[t]he defaulting party has the burden of proving that the default . . . should be set aside," *Nikwei v. Ross Sch. of Aviation, Inc.*, 822 F.2d 939, 941 (10th Cir. 1987). The decision whether to set aside the default is committed "to the sound discretion of the trial court," and "will not be disturbed on appeal, unless [it] is judged to be 'clearly wrong.'" *Id.* (quoting *Barta v. Long*, 670 F.2d 907, 910 (10th Cir. 1982)).

In addition, a "district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986). A district court has personal jurisdiction only over defendants who have properly been served, *see Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987), and "[d]efects in personal jurisdiction . . . are not waived by default when a party fails to appear or respond," *Williams*, 802 F.2d at 1202. It thus follows that if the Defendants were not properly served, the court lacked jurisdiction to enter the default, which must then be set aside—regardless of the good-cause analysis. *See Hukill v. Oklahoma Native Am. Domestic Violence Coal.*, 542 F.3d 794, 802 (10th Cir. 2008).

4

## A.

The court will accordingly assess its jurisdiction before considering any of the other issues raised by the parties. Nanchang argues that it was not properly served because Purple's use of email service violated the Hague Service Convention, 20 U.S.T. 361 (1965). The court rejects this argument.

The Hague Service Convention is a multilateral treaty to which the United States and China are both parties. It governs "all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." Article 1, 20 U.S.T. at 362.

Some provisions of the Convention expressly authorize specific methods of service: for instance, Articles 2 through 7 provide for service through a "Central Authority" that each signatory state must establish for that purpose, *see id.* at 362–63, and Article 8 permits, in certain circumstances, each signatory state to effect service "directly through its diplomatic or consular agents," *id.* at 363.

Other provisions clarify that the Convention does not prohibit other service methods that signatory states may have established. For example, Article 11 provides that the Convention does not prohibit signatory states from forming separate agreements about permissible service methods. *See id.* at 363–64. Similarly, Article 19 makes clear that the Convention does not preempt the internal laws of a signatory state that govern "service within its territory." *Id.* at 365. And, of particular relevance here, Article 10 outlines alternative service methods that the "Convention shall not interfere with," so long as "the State of destination does not object" to them. *Id.* 363. Among these methods is "the freedom to send judicial documents, by postal channels, directly to persons abroad." Article 10(a), 20 U.S.T. at 363.

Nanchang's primary argument is that the Convention comprises an exclusive list of permissible international service options and, because service by email is not on that list, the Convention prohibits its use. *See* Dkt. No. 146 at 6–10. For support, Nanchang notes that the Supreme Court has held that "the Convention pre-empts inconsistent methods of service," *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988); *accord Water Splash, Inc. v. Menon*, 581 U.S. 271, 273 (2017), describing "compliance with the Convention" as "mandatory in all cases to which it applies," *Volkswagenwerk*, 486 U.S. at 705. Nanchang also cites a few district court decisions that have interpreted the Convention to establish an exclusive list. *See Smart Study Co. v. Acuteye-U.S.*, 620 F. Supp. 3d 1382 (S.D.N.Y. 2022); *Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co.*, 480 F. Supp. 3d 977 (N.D. Cal. 2020); *Anova Applied Elecs., Inc. v. Hong King Grp.*, 334 F.R.D. 465 (D. Mass. 2020); *CRS Recovery, Inc. v. Laxton*, No. C 06-7093, 2008 WL 11383537 (N.D. Cal. Jan. 8, 2008).

The Tenth Circuit, however, has squarely rejected this reading of the Convention. In *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, the plaintiff had, with the district court's authorization, served a Mexican company through its American counsel. *See* 970 F.3d 1269, 1276 (10th Cir. 2020). The Tenth Circuit considered whether, in light of the specification in Federal Rule of Civil Procedure 4(f)(3) that a foreign individual may be served "by other means not *prohibited* by international agreement," the Hague Service Convention prohibited service through counsel as authorized by the district court. The defendant argued that because Mexico had objected to alternative service under Article 10 of the Convention, any method of service other than those explicitly listed in the Convention was invalid.

The Tenth Circuit rejected this argument, explaining that "the relevant inquiry under Rule 4(f)(3) is not whether the [international] agreement affirmatively endorses service," but instead "whether the alternative service method in question is 'prohibited' by the agreement." *Compañía de Inversiones Mercantiles*, 970 F.3d at 1294. And because "the Convention does not contain a specific prohibition on this form of service"—that is, on serving a foreign company through its American counsel—the Tenth Circuit held that a district court could properly authorize that form of service under Rule 4(f)(3). *Id.* at 1294–95.

To be sure, service by email was not at issue in *Compañía de Inversiones Mercantiles*. Indeed, the Tenth Circuit expressly reserved the question whether Article 10 of the Hague Service Convention prohibits this method of service when a signatory state objects to service "by postal channels." *See id.* at 1295 n.5. And some district courts have read a signatory state's Article 10 objection to service by "postal channels" to also bar service by email. *See, e.g.*, *Luxottica Grp. S.p.A. v. Partnerships & Unincorporated Ass'ns*, 391 F. Supp. 3d 816, 824–27 (N.D. Ill. 2019); *Habas Sinai Ve Tibbi Gazlar Istihsal A.S. v. International Tech. & Knowledge Co.*, No. CV 19-608, 2019 WL 7049504, at *3–4 (W.D. Pa. Dec. 23, 2019); *cf. Anova*, 334 F.R.D. at 470–71 (describing the debate on this issue).

The court declines to follow these decisions and adopt this expansive reading of Article 10(a). First, these decisions appear to be premised on the view that the Convention prohibits what it does not expressly allow, *see, e.g.*, *Luxottica*, 391 F. Supp. 3d at 827; *Habas Sinai*, 2019 WL 7049504 at *4—in other words, the precise reading of the Convention that the Tenth Circuit has rejected. Second, reading a prohibition on service "by postal channels" to prohibit service by email presents obvious textual difficulty. *See Anova*, 334 F.R.D. at 470. Third, to the extent that it is relevant, there are sound reasons why a signatory state might object to service by postal mail

7

but not by email: for example, "[e]mail communications may be more reliable than long-distance postal communications," *Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 332 (S.D.N.Y. 2015), "the arrival of an email at its destination address may be more readily tracked," *id.*, and an email recipient can "promptly reply to either confirm or deny that the sender has the correct address," *Anova*, 334 F.R.D. at 471. Fourth, other judges in this district have uniformly rejected this strained textual reading of Article 10(a). *See, e.g.*, *The Neck Hammock, Inc. v. Danezen.com*, No. 2:20-cv-287, 2020 WL 6364598 at *4 (D. Utah Oct. 29, 2020) (citing *Sulzer*); *DP Creations, LLC v. Reborn Baby Mart*, No. 2:21-cv-574, 2021 WL 11585915 at *8 (D. Utah Nov. 22, 2021) (citing *Neck Hammock*).

For all of these reasons, the court concludes that Purple's email service of the Defendants was not barred by the Hague Service Convention. And Nanchang has not raised—nor has the court identified—any other reason to doubt its jurisdiction.

## B.

Having rejected Nanchang's principal argument, the court next considers whether Nanchang has otherwise shown good cause under Federal Rule of Civil Procedure 55(c) for setting aside the default entered against it. The court concludes that Nanchang has not.

The Tenth Circuit has identified three factors that may be relevant "in determining whether a defendant has met the good cause standard" under Rule 55(c). *Hunt v. Ford Motor Co.*, 65 F.3d 178, 1995 WL 523646 at *3 (10th Cir. 1995) (unpublished table decision). Those factors include: "(1) whether the default was the result of culpable conduct of the defendant, (2) whether the plaintiff would be prejudiced if the default should be set aside, and (3) whether the defendant presented a meritorious defense." *Id.* (citing *In re Dierschke*, 975 F.2d 181, 183 (5th Cir. 1992)); *see also Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 750 (10th Cir.

2009) (quoting *Dierschke*). But a "court need not consider all the factors"; instead, "[i]f the default was the result of the defendant's culpable conduct," then a court may deny a motion to set it aside "on that basis alone." *Hunt*, 1995 WL 523646 at *3 (citing *Dierschke*, 975 F.2d at 184).

Nanchang's conduct here was highly culpable. Courts frequently hold that a "defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and intentionally failed to answer." *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988). Nanchang does not dispute that it received actual notice via email of Purple's lawsuit in May 2023, but failed timely to respond. Indeed, Nanchang appears to concede that it received actual notice, contending that "it was confused by the Complaint, which seemed to contradict every notion of fairness." Dkt. No. 154 at 6.

The only excuse that Nanchang offers for its default is that, "[a]s a small startup [based in China], Nanchang should not be expected to have enough resources to consult an American attorney in China in a timely manner." Dkt. No. 154 at 6. In effect, Nanchang proposes excepting small foreign companies from the deadlines of the Federal Rules of Civil Procedure. That is not a tenable proposition.

Moreover, even accepting the proposition that a small foreign company's delay could be justified by the need to consult an American attorney, the length of Nanchang's delay here would still be inexcusable. As discussed, two of its attorneys entered appearances on July 14, 2023, *see* Dkt. Nos. 141 & 142, but they did not make any responsive filing to Purple's complaint; indeed, they did not make any substantive filings at all until five weeks later, *see* Dkt. No. 146, and even then, only after prompting from this court, *see* Dkt. No. 145. In total, 35 days elapsed between when Nanchang's attorneys first entered an appearance and when they finally made any

substantive filing; the Federal Rules, however, require a defendant to respond by answer or motion "within 21 days after being served with the summons and complaint." Fed. R. Civ. P. 12(a)(i).

Because Nanchang's failure to respond to Purple's complaint was highly culpable—indeed, it appears, willful—this court declines to set aside the default entered against it.[2]

### III.

The court now turns to Purple's motion for a preliminary injunction. "A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and will be granted only if "the movant's right to relief [is] clear and unequivocal," *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (cleaned up). A party seeking such relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The court concludes that Purple has shown it is entitled to a preliminary injunction.

---

[2] In light of Nanchang's culpability, the court need not address the other two good-cause factors: Purple's prejudice and Nanchang's assertion of meritorious defenses. To be sure, the federal courts of appeals appear divided on the precise formulation of these factors, and whether they are conjunctive or disjunctive. *See Dierschke*, 975 F.2d at 183–84 (describing this division). But as discussed, the Tenth Circuit—at least in an unpublished decision—has concluded that a defendant's culpability alone may justify denying his motion to set aside a default. *See Hunt*, 1995 WL 523646 at *3. In all events, even were it to consider the two other good-cause factors, the court would find that each of these also weighs against Nanchang. As for prejudice, while delay alone may not suffice, here—as discussed in more detail below, *see infra* p. 16—Purple maintains an unrebutted statutory presumption of irreparable harm. With every passing day, it thus suffers harm that monetary damages cannot rectify and is thereby prejudiced. As for Nanchang's asserted defenses, the court concludes that none are meritorious, even accepting Nanchang's version of the facts as true. *See infra* pp. 12–16.

## A.

In evaluating whether Purple is likely to succeed on the merits of its claims, the court takes the well-pleaded factual allegations in its complaint as true. That is the consequence of the Defendants' default; it is as though the Defendants have admitted Purple's well-pleaded allegations. *See Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1125 & n.11 (10th Cir. 2003); *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (Wisdom, J.).

Nevertheless, Purple must still show—based on these well-pleaded facts—that as a legal matter it is likely to succeed on the merits of its claims. *See Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010). To succeed on its trademark-infringement claims, Purple must prove three elements: (1) that it has a "protectable interest" in its marks, (2) that the Defendants have "used an identical or similar mark in commerce," and (3) that the Defendants' use "is likely to confuse consumers." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013) (cleaned up).

As for the first element, Purple alleges in its complaint that both of the trademarks at issue are registered, that the registrations have never been cancelled, and that it owns both of the marks. *See* Dkt. No. 94 at 14 ¶¶ 46–47. Accepting these allegations as true establishes a rebuttable presumption that Purple's marks are valid and protectable. *See* 15 U.S.C. § 1115(a).

Most of the Defendants have not appeared, and thus have asserted no basis for rebutting that presumption. Nanchang asserts only one: that Purple's marks are "functional," and thus invalid.

Nanchang is correct that a trademark cannot validly protect a "functional" feature; the protection of such features falls instead within the domain of patent law. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164–65 (1995). A feature is "functional . . . if it is essential

11

to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex*, 514 U.S. at 165). But where the "function" of the feature is merely that it appeals to consumers' tastes—that is, in a case of so-called "aesthetic" functionality, *see, e.g.*, *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 219–22 (2d Cir. 2012)—then the party challenging the mark must also show that "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex*, 514 U.S. at 165; *see also TrafFix*, 532 U.S. at 32–33 (noting that *Qualitex*'s "significant non-reputation-related disadvantage" inquiry is necessary only in cases of aesthetic functionality).

Because Purple's marks are presumed valid, Nanchang bears the burden of producing evidence that the contested marks are functional. *See, e.g.*, *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 172 (7th Cir. 1996) (Posner, C.J.). In an attempt to satisfy this burden, Nanchang points to (1) some of Purple's utility patents, which describe how dyeing pillows or cushions a "soothing color" such as "purple or lavender" may create "an appearance appealing to consumers," Dkt. No. 147 at 7 (quoting U.S. Patent Nos. 8,919,750, 10,772,445, & 10,863,837), and (2) two internet articles purportedly describing purple as a "popular" color, *see id.* at 11.[3]

But, while a trademark holder's utility patents are "strong evidence that the features therein claimed are functional," *TrafFix*, 532 U.S. at 29, the statements that Nanchang relies on are found in the patents' *specifications*, not their *claims*. Regardless, none of the evidence that

---

[3] Patent No. 8,919,750 also suggests that "a cushioning element having a dark color may absorb radiation differently than a cushioning element having a light color." *Id.* at 6:54–56 (cleaned up). But Nanchang does not assert that the shade of purple that it, or Purple, has chosen for its products is the sort of "dark color" that may have this effect, nor does it seem to rely on this portion of the patent in its briefing.

12

Nanchang identifies suggests that Purple's trademarks would put it (or anyone else) at a "significant non-reputation-related disadvantage." Such a showing is required because the asserted "function" here—that purple is "appealing" or "soothing"—is merely aesthetic. Even if purple is an "appealing" or "soothing" color, Nanchang provides no evidence that there is a paucity of other appealing or soothing colors from which to make pillows or seat cushions. Nanchang has accordingly failed to produce evidence sufficient to show that Purple's marks are functional, and thus to rebut the presumption that Purple's trademarks are valid.

The second element of Purple's trademark-infringement claim is that the Defendants have used an identical or similar mark in U.S. commerce. *See 1-800 Contacts*, 722 F.3d at 1238. Purple has easily shown that it is likely to succeed on this element: it has attached exhibits to its complaint that allegedly show examples of accused products that Purple purchased online from each of the Defendants and had shipped Utah. *See* Dkt. Nos. 94-12; 94-13; 94-14; 94-18; 94-19; 94-20; 94-23; 94-30; 94-35; *see also* Dkt. No. 94 at 10 ¶ 36.

The final element of Purple's claim is a likelihood of confusion between its products and the allegedly infringing products. *See 1-800 Contacts*, 722 F.3d at 1238. The Tenth Circuit uses a balancing test with six non-exhaustive factors to assess the likelihood of confusion. *See First Savings Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 652 (10th Cir. 1996). Those factors include:

> (a) the degree of similarity between the marks; (b) the intent of the alleged infringer in adopting its mark; (c) the relation in use and the manner of marketing between the goods or services marketed by the competing parties; (d) the degree of care likely to be exercised by purchasers; (e) evidence of actual confusion; and (f) the strength or weakness of the marks.

*Id.*

The court has little doubt Purple's marks are relatively "strong"—which is to say they are "distinctive" and have a strong "capacity to indicate the source of the goods . . . with which [they

are] used." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1151 (10th Cir. 2013) (cleaned up). Although a color is never *inherently* distinctive, *see Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211–12 (2000), it can *acquire* distinctiveness if it develops "secondary meaning" among the consuming public, who then associate a product of that color with a certain company or brand, *Qualitex*, 514 U.S. at 162–63. Because the '732 Mark and the '734 Mark are registered under 15 U.S.C. § 1052(f), they seemingly must be presumed as a matter of law to have acquired such secondary meaning, and thus—at a minimum—the requisite "distinctiveness" to qualify as protectable trademarks. *See* 15 U.S.C. § 1115(a); *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1356 (Fed. Cir. 2009). Further bolstering this presumed secondary meaning, the complaint pleads at some length facts about Purple's extensive marketing of its products. *See* Dkt. No. 94 at 15–16 ¶¶ 50–51; *cf. Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1253–54 (10th Cir. 2016) (citing *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1126–27 (Fed. Cir. 1985)). And, in evaluating the strength of Purple's marks, it cannot escape judicial notice that the trademarked color of its products is the very name of the company itself.

Next, and most critically, it appears that Defendants' allegedly infringing products use the color purple in a manner that is extremely similar in appearance to Purple's marks. The Tenth Circuit has described the "similarity of the marks" as the "first and most important" of the *First Savings* factors. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090–91 (10th Cir. 1999). Here, simply looking at photographs of the allegedly infringing products confirms this similarity. *See* Dkt. Nos. 94-12; 94-13; 94-14; 94-18; 94-19; 94-20; 94-23; 94-30; 94-35. Further, the accused products are marketed and sold via the same channels—that is,

internet platforms like Amazon.com—as Purple's trademarked products, evincing a close "relation in use and manner of marketing" between the accused and the trademarked products.

To be sure, Purple has not provided evidence of actual confusion among consumers. But it is well settled that a "plaintiff need not set forth evidence of actual confusion to prevail in a trademark infringement action." *King of the Mountain*, 185 F.3d at 1092. And none of the Defendants has provided any evidence that there has *not* been actual confusion. This factor is thus neutral. *Compare Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 1999), *with Universal Money Centers, Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1534–36 (10th Cir. 1994).

Finally, Nanchang asserts that its infringement was not intentional, and that consumers of these products are not likely to exercise a high level of care given the relatively low cost of the products involved. *See* Dkt. No. 147 at 14–15; Dkt. No. 154-1 at 3 ¶¶ 8–9. The court does not necessarily agree with either assertion; but, even accepting Nanchang's argument, the court concludes these factors are likely outweighed by the strength of Purple's marks, the high degree of similarity between the products involved here, and the fact that products are marketed and sold on the same platforms. Purple has thus demonstrated that it is likely able to make a *prima facie* case of trademark infringement.

Nanchang also asserts that it began selling its products before Purple registered its marks. *See* Dkt. No. 147 at 15; Dkt. No. 154-1 at 3 ¶ 7. This, Nanchang argues, entitles it to a "prior use" defense "under 15 U.S.C. § 1115(b)(2)." Dkt. No. 147 at 15. But as Purple notes, that statutory provision does not apply here, because it does not provide "a defense to the merits of an infringement action." *GTE Corp. v. Williams*, 904 F.2d 536, 540 (10th Cir. 1990).

Assuming that Nanchang instead means to assert a *common law* prior-use defense, that would fail too, because this defense requires a showing that the defendant's use of the mark was "geographically remote." *See id*. at 541. Here, however, Nanchang admits that it sells the accused products "via Amazon.com," Dkt. No. 154-1 at 3 ¶ 7, which clearly has international reach and directly overlaps with Purple's marketing of its trademarked products.

**B.**

The court concludes that Purple easily satisfies the other requirements for obtaining a preliminary injunction. First, a trademark plaintiff seeking a preliminary injunction is "entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits," 15 U.S.C. § 1116(a), and Nanchang—the only one of the Defendants to appear—has not sought to rebut that presumption. Second, the Defendants do not have a valid interest in selling infringing products that could outweigh the Purple's presumed irreparable injury. Finally, the public has a strong interest in the enforcement of intellectual property laws.

The court will accordingly grant the preliminary injunction that Purple requests.[4]

---

[4] While Nanchang has opposed Purple's preliminary-injunction motion generally, it has not presented any arguments specifically opposing Purple's request for an asset freeze. In *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, the Supreme Court held that a court lacks equitable authority to impose a preliminary injunction freezing assets where the plaintiff seeks only monetary damages. *See* 527 U.S. 308 (1999). But in that case, the Court expressly distinguished cases where a plaintiff also seeks final equitable relief. *See id.* at 324–25 (discussing *Deckert v. Independent Shares Corp.*, 311 U.S. 282 (1940)). Here, Purple sought final equitable relief against the Defendants in its complaint. *See* Dkt. No. 94 at 34 ¶¶ I–J; *id.* at 36–37 ¶¶ P–Q & S. It follows that *Grupo Mexicano* does not bar an asset freeze in this case.

\* \* \*

For the foregoing reasons, Nanchang's motion to set aside the default is **DENIED** and Purple's motion for a preliminary injunction and expedited discovery is **GRANTED**.[5]

**IT IS SO ORDERED**.

Dated this 29th day of March, 2024.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge

---

[5] Nanchang offers no argument specifically opposing Purple's request for expedited discovery, and the court finds that there is good cause for ordering the requested discovery here.